Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————

Argued December 5, 2002        Decided February 4, 2003

No. 02-5037

ROLE MODELS AMERICA, INC.,
APPELLANT

v.

THOMAS E. WHITE, SECRETARY OF THE ARMY,
AND RODERICK R. PAIGE, SECRETARY OF THE
DEPARTMENT OF EDUCATION,
APPELLEES

—————

Appeal from the United States District Court
for the District of Columbia
(No. 01cv01595)

—————

*P. David Richardson* argued the cause for appellant. With him on the briefs was *Joseph C. Port Jr.*

*Joel Wilson*, Assistant U.S. Attorney, argued the cause for appellees. With him on the brief were *Roscoe C. Howard Jr.*,

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: GINSBURG, *Chief Judge*, and ROGERS and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: This case involves a challenge to the Secretary of Defense's decision to convey a closed military base to a state-created development corporation. Because the procedures by which the Secretary reached this decision violated applicable statutory and regulatory requirements, we reverse the district court's contrary conclusion and remand with instructions to enjoin the conveyance.

## I.

The Defense Base Closure and Realignment Act of 1990 (DBCRA), 104 Stat. 1808 (codified as amended at 10 U.S.C. § 2687 note), establishes a mechanism for the "timely closure and realignment of military installations inside the United States." *Id.* § 2901(b) (for ease of reference, all citations to the DBCRA are to the Act as it appears in note following 10 U.S.C. § 2687). The Act requires the Secretary of Defense to determine, within six months of a decision to close a military base, whether other federal departments or agencies can use the property. *Id.* § 2905(b)(5)(A). If none can, the Secretary must "publish in the Federal Register and in a newspaper of general circulation in the communities in the vicinity of the installation," *id.* § 2905(b)(7)(B)(i)(IV), an announcement that "surplus" property exists, *id.* § 2905(b)(7)(B)(i)(II). Thirty days thereafter, the Local Redevelopment Authority (LRA), an entity "established by State or local government and recognized by the Secretary of Defense," 24 C.F.R. § 586.5; 32 C.F.R. § 176.5, must "[p]ublish, . . . in a newspaper of general circulation in the communities in the vicinity of the installation, the time period during which the LRA will receive notices of interest from . . . representatives of the homeless[ ] and other interested par-

ties," 24 C.F.R. § 586.20(c)(1); 32 C.F.R. § 176.20(c)(1). Notices of interest "shall describe the need of the [applicant] for the buildings or property," DBCRA § 2905(b)(7)(C)(i), and must include, at a minimum, "a description of the planned use," 24 C.F.R. § 586.20(c)(2)(ii)-(2)(iii); 32 C.F.R. § 176.20(c)(2)(ii)-(2)(iii). "Other interested parties" means "any parties eligible for the conveyance of property . . . under . . . the Federal Property and Administrative Services Act of 1949 [(FPASA), 40 U.S.C. § 101 *et seq.*]," DBCRA § 2905(b)(7)(P)—a statute designed to provide "an economical and efficient system for . . . [d]isposing of surplus [federal] property," 40 U.S.C. § 101(3). Non-profit educational institutions, if recommended by the Secretary of Education, are among the groups eligible for FPASA conveyances. *Id.* § 550(c).

After the LRA publishes the required notice, the process bifurcates: Notices of interest submitted by representatives of the homeless and those submitted by FPASA-eligible "other interested parties" are considered on separate, parallel tracks. On the homeless-assistance track, the LRA begins by considering both homeless submissions and potential commercial uses in order to formulate a comprehensive redevelopment plan for the surplus property. DBCRA § 2905(b)(7)(F). The LRA then submits its plan to the Secretary of Housing and Urban Development, who in turn determines whether the LRA has "balance[d]" commercial and homeless needs "in an appropriate manner." *Id.* § 2905(b)(7)(H)(i)(III). Meanwhile, on the other track, the Secretary of Defense evaluates any notices of interest submitted by FPASA-eligible parties. *Id.* § 2905(b)(7)(K)(v). This process occurs *before* the LRA submits its plan to the HUD secretary. *Id.* If the Secretary of Defense determines that an "other interested" applicant meets the eligibility standards established by the FPASA and associated regulations, the Secretary effects a "public benefit conveyance" of the requested property to that party. *Id.* After completion of the two parallel processes — that is, after the Secretary of Defense has conducted the public benefit conveyance screenings and the HUD Secretary has approved the LRA's plan — the Secretary of Defense "shall dispose" of the remaining base property, giving "substantial deference"

to the LRA's redevelopment plan. *Id.* § 2905(b)(7)(K)(i), (K)(iii).

This case involves the application of the DBCRA's disposition procedures to Fort Ritchie, a U.S. Army base located in the Catoctin mountains of western Maryland. Fort Ritchie's history as a military installation began in 1926 when Maryland purchased the property — previously a resort for wealthy Mid–Atlantic urbanites — to create a national guard training site, naming it for then-Governor Albert C. Ritchie. Military District of Washington, *Fact Sheet: Fort Ritchie Background, at* http://www.mdw.army.mil/fs-i12.htm (Dec. 11, 2002). During World War II, the Army used Fort Ritchie for counterintelligence training, including staging mock Nazi rallies in a specially built *faux* Bavarian village. *See* Steve Vogel, *In Western Md., Fort Ritchie Leaving Military for Civilian Life*, WASH. POST, July 17, 1998, at C1. The Army even brought German and Japanese prisoners-of-war to the base to provide trainees with authentic interrogation experience. *Id.* During the 1950s, the Army used the fort as a support base for nearby Site R, a top-secret command structure known as the "underground Pentagon." *Id.* Beginning in the 1970s, Fort Ritchie became a high-tech military communications center. *Id.* By the mid–1990s, however, the fort had outlived its usefulness, and the Secretary of Defense and the President slated it for closure during the 1995 base closure round. *See* Notice of Recommended Base Closures and Realignments, 60 Fed. Reg. 11414, 11436 (Mar. 1, 1995) (Secretary of Defense recommending closure of the base); President's Message to Congress Transmitting Recommendations of the Defense Base Closure and Realignment Commission, H.R. DOC. NO. 104–96, at 1 (1995) (President accepting recommendation).

On May 10 and May 15, 1996, the Department of Defense, acting pursuant to its duties under the Act, published notices in the Federal Register and a local newspaper. *See* Notice of Availability of Surplus Land and Buildings in Accordance with Public Law 103–421 Located at Fort Ritchie Military Reservation, Cascade, MD, 61 Fed. Reg. 21,445–05 (May 10,

1996); THE HERALD–MAIL, May 15, 1996, at C8. Also on May 10, the Fort Ritchie LRA (later renamed PenMar Development Corporation) published two notices, virtually identical to each other, entitled "Homeless Assistance Outreach Initiative." These notices announced:

> The Fort Ritchie Local Redevelopment Authority . . . will receive Notices of Interest from representatives of agencies that seek to serve the needs of our community's homeless population, (Washington County, Maryland and Franklin County, Pennsylvania), until 4:30 p.m., August 9, 1996 . . . .

> Notices of Interest must include at least the following: a description of the proposed homeless assistance program, including the specific proposed reuse of property or facilities, such as supportive services, job and skills training, employment programs, emergency shelters, traditional or permanent housing, food and clothing banks, treatment facilities or other activities that meet homeless needs as assessment of the need for the program; a description of the extent to which the program is or will be coordinated with other homeless assistance programs in the community; information about the physical requirements necessary to implement the program, including a description of the buildings and property that are necessary in order to carry out the program; a description of the financial plan, the organization and the organizational capacity of the representative to carry out the program; and an assessment of the time required in order to commence carrying out the proposed program.

Joint Appendix (J.A.) 71 (*reprinting LRA–1 Public Notice, Homeless Assistance Outreach Initiative, Fort Ritchie, Cascade, MD,* THE HERALD–MAIL, May 10, 1996 (page number omitted in J.A.)); *LRA–1 Public Notice, Homeless Assistance Outreach Initiative, Fort Ritchie, Cascade, MD,* THE RECORD HERALD, May 10, 1996, at 10B. As of December 1997, when PenMar submitted its redevelopment plan to HUD, the Secretary of Defense had conducted no public benefit conveyance screenings. HUD approved the plan, and then, in August

1998, the Secretary of Defense published a "Record of Decision" (ROD) in the Federal Register accepting the plan. *See* Notice of Record of Decision on the Final Environmental Impact Statement (FEIS) on the Disposal and Reuse of the U.S. Army Garrison, Fort Ritchie, Washington County, Maryland, 63 Fed. Reg. 43383 (August 13, 1998). Under the Act, publication of the ROD obligated the Secretary of Defense to dispose of the property in accordance with the LRA's plan. DBCRA § 2905(b)(7)(K)(iii).

Appellant Role Models America, Inc., a non-profit educational institution, seeks to convert surplus military bases into military-style preparatory academies for at-risk secondary-school dropouts. To support this effort, Congress appropriated $10 million in start-up funding to "establish an academy that consists of a residential center located on the site of a military installation closed or realigned pursuant to a law providing for closures and realignments of such installations." 29 U.S.C. § 2914(g)(2); H.R. REP No. 105–825, at 1257 (1998) (encouraging Department of Labor to make funds available to Role Models). Interested in using Fort Ritchie as a school, Role Models approached PenMar in December 1996 about a public benefit conveyance screening. PenMar replied that "it was not the appropriate screening time." Alexander Decl. ¶ 13. Later, PenMar told Role Models that "the screening process for the educational conveyance provisions was not required at Fort Ritchie." *Id.*

Claiming that it was entitled to a public benefit conveyance screening regarding the Fort Ritchie property, Role Models filed suit in the United States District Court for the District of Columbia against the Secretaries of the Army and of Education, requesting a temporary restraining order and a preliminary injunction prohibiting the conveyance of Fort Ritchie to PenMar until the Government conducted a proper screening. The district court denied injunctive relief, finding that Role Models failed to satisfy any of the requirements for a preliminary injunction. *Role Models Am., Inc. v. White*, 193 F. Supp. 2d 76 (D.D.C. 2002). Role Models appeals, seeking interlocutory relief pursuant to 28 U.S.C. section 1292(a)(1).

**II.**

As a threshold matter, the Government argues that its action is not "final" within the meaning of section 704 of the Administrative Procedure Act because the Secretary of Defense has yet to convey Fort Ritchie to PenMar. *See* 5 U.S.C. § 704. The standards for determining finality of agency action are well-established. To be final, an action need not be "the last administrative [action] contemplated by the statutory scheme." *Envtl. Def. Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 590 n.8 (D.C. Cir. 1971). Rather, the question is whether the agency has "impose[d] an obligation, denie[d] a right, or fixe[d] some legal relationship . . . ." *Meredith v. Fed. Mine Safety and Health Review Comm'n*, 177 F.3d 1042, 1047 (D.C. Cir. 1999) (internal quotation marks and citation omitted).

Applying this standard, we have no doubt that the Government's action is final. By publishing the ROD, the Defense Department obligated itself to convey the property to PenMar. *See* DBCRA § 2905(b)(7)(K)(iii). Base closure cases that have found a lack of final agency action, *e.g.*, *Dalton v. Specter*, 511 U.S. 462 (1994), do not require a contrary result since such cases addressed the Secretary of Defense's *nonbinding* base closure recommendations to the President. In any event, the Government's action in this case would be final and reviewable even if the ultimate disposition of Fort Ritchie remained an open question since, according to the Government, potential public benefit conveyees such as Role Models had only until August 9, 1996, the deadline set in the May 10 newspaper notices, to apply for a conveyance. Role Models' disqualification from seeking a public benefit conveyance after that date constitutes "deni[al] [of] a right" for purposes of APA review.

Turning to the merits, the Government argues that the two identical May 10 notices fulfilled the LRA's obligation to notify "representatives of the homeless[ ] and other interested parties" of the deadline for submitting notices of interest. 24 C.F.R. § 586.20(c)(1); 32 C.F.R. § 176.20(c)(1). We disagree. We cannot imagine how Role Models, an organization devoted

to establishing schools for at-risk minors, could possibly have interpreted a notice entitled "Homeless Assistance Outreach Initiative" as an invitation to apply for the Fort Ritchie property. Even if Role Models discounted the title, the notice's very first sentence informs readers that the LRA would "receive Notices of Interest from representatives of agencies that seek to serve the needs of our community's homeless population." Reinforcing the message that the LRA's exclusive interest was in proposals to help the homeless, the notice goes on to describe elements of a suitable submission: "[proposals for] emergency shelters, . . . food and clothing banks, treatment facilities or other activities that meet homeless needs, . . . [and] a description of the extent to which the program is or will be coordinated with other homeless assistance programs in the community. . . ." None of these requirements could relate to a proposal from Role Models to operate a school for at-risk students. The two notices thus failed to fulfill the requirement that the LRA "*shall* [p]ublish" the time period in which it will receive notices from "representatives of the homeless[ ] *and other interested parties*." 24 C.F.R. § 586.20(c)(1) (emphasis added); 32 C.F.R. § 176.20(c)(1) (emphasis added).

The Government argues that the Secretary's May 10 and May 15 notices, which unquestionably fulfilled the requirements of DBCRA section 2905(b)(7)(B)(i)(IV), performed double-duty by also fulfilling the requirements of 24 C.F.R. section 586.20(c)(1) and 32 C.F.R. section 176.20(c)(1). Again, we disagree. The two notices announcing the surplus property's availability failed to fulfill the entirely different requirements that the regulations impose on the LRA — to inform "representatives of the homeless[ ] and other interested parties" of the deadline for submitting notices of interest. Even if Role Models had been so fluent in DBCRA arcana as to realize that the surplus property announcement obligated the LRA to collect notices of interest soon thereafter, it still would not have known of the August 9 deadline. Contrary to the implication of the Government's argument, we think it quite reasonable to assume that two distinct notice requirements obligating different parties to impart different informa-

tion are not redundant. *Cf. Moskal v. United States*, 498 U.S. 103, 109 (1990) ("[A] court should 'give effect, if possible, to every clause and word of a statute.'") (citation omitted).

At oral argument, Government counsel insisted that the regulations do not require the LRA to notify "other interested parties" despite language directing that the LRA "*shall*" inform "representatives of the homeless[ ] *and other interested parties*" of the deadline. 24 C.F.R. § 586.20(c)(1) (emphasis added); 32 C.F.R. § 176.20(c)(1) (emphasis added). Urging us to chalk this plain language up to "less than careful draftsmanship," counsel argued that a literal reading is incompatible with a subsequent regulation providing that "[i]n addition [to the formal notice requirement], the LRA has the option to conduct an *informal* solicitation of notices of interest from [potential public benefit conveyees]." 24 C.F.R. § 586.20(c)(1)(i) (emphasis added); 32 C.F.R.§ 176.20(c)(1)(i) (emphasis added). Even were this argument not untimely, *Tarpley v. Greene*, 684 F.2d 1, 7 n.17 (D.C. Cir. 1982) ("[O]ral argument on appeal is not the proper time to advance new arguments or legal theories. . . ."), we would flatly reject it. One provision *requires* that the LRA *formally* notify "representatives of the homeless[ ] and other interested parties"; the other *permits* the LRA to "*informal[ly]*" notify the latter group. Given the well-recognized flaws inherent in constructive notice, *see Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950) ("It would be idle to pretend that publication alone . . . is a reliable means of [notification]" since "[c]hance alone brings to the attention of even a local resident an advertisement in small type inserted in the back pages of a newspaper."), it seems neither strange nor redundant to provide for informal notice as a complement to a scheme of formal notice through publication.

In sum, none of the Government's arguments rebuts the fact that potential public benefit conveyees such as Role Models failed to receive the notice mandated by regulation. Nor, in view of the Act's overall structure, can we dismiss this as a merely technical violation. The Secretary of Defense's obligations to (1) conduct public benefit conveyance screenings and (2) accept only HUD-approved LRA redevelopment

proposals, taken together, guarantee that the Government will consider all proposals submitted by public interest groups. These procedural guarantees — checking the LRA's institutional inclination to develop surplus property commercially — mean nothing if public interest groups do not know of their right to submit proposals in the first place.

Role Models' experience perfectly illustrates the need for proper notice. The LRA's procedural errors prevented Role Models from triggering a public benefit conveyance screening, thereby depriving it of a valuable right under the Act. Attempting to turn this error into a defense, the Government argues that because "the LRA received no [timely] notice of interest from [potential public benefit conveyees], . . . there was no public benefit screening notice of interests to consider." Appellees' Br. at 16. This makes no sense. Although the Government is certainly correct that it could not have screened notices of interest that it never received, here it received none precisely because the LRA failed to give proper notice.

The district court's order is reversed and this matter remanded with instructions to enter a permanent injunction against conveyance of the Fort Ritchie property until the Government remedies the procedural errors described above.

*So ordered.*