Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Decided January 13, 2004

No. 02-5037

ROLE MODELS AMERICA, INC.,
APPELLANT

v.

LES BROWNLEE, ACTING SECRETARY OF THE ARMY, ET AL.,
APPELLEES

———

On Appellant's Application for Attorneys' Fees

———

*P. David Richardson* filed the application for attorneys' fees on behalf of appellant. With him on the application was *Joseph C. Port Jr.*

*R. Craig Lawrence*, Assistant U.S. Attorney, filed the opposition on behalf of appellees. With him on the opposition were *Roscoe C. Howard Jr.*, U.S. Attorney, and *Claes H. Lewenhaupt*, Special Assistant.

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Before: GINSBURG, *Chief Judge*, and ROGERS and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: In an earlier decision in this case, we ordered the Secretary of the Army to correct procedural errors he committed in disposing of excess military property, errors that deprived appellant, a non-profit organization, of an opportunity to compete for the property. For its work in securing that decision, appellant now seeks an award of attorneys' fees pursuant to the Equal Access to Justice Act. Because appellant has satisfied the statutory requirements for an award, we grant its application for fees. But because it has failed to justify the amount it seeks, we award significantly less than requested.

## I.

Our previous opinion fully describes the background of this case, *see Role Models Am., Inc. v. White*, 317 F.3d 327, 328–31 (D.C. Cir. 2003), so we only summarize it here. Appellant Role Models America, Inc., a non-profit educational organization, seeks to establish a military-style magnet high school for troubled youth. In the mid–1990s, as part of its plan to locate the high school on a former military installation, Role Models attempted to acquire Fort Ritchie, a closed U.S. Army base in Maryland. When its efforts proved unsuccessful, Role Models filed suit in the United States District Court for the District of Columbia, claiming that the Secretary of the Army, one of the officials responsible for disposing of Fort Ritchie, had violated federal regulations by failing to provide adequate notice of the fort's availability. In its complaint, Role Models asked the district court to declare that the Secretary's failure to provide adequate notice was unlawful; to direct the Secretary to comply with regulatory requirements, thus giving Role Models an opportunity to compete for the property; and to enjoin any conveyance of Fort Ritchie until the Secretary did so—or, alternatively, to require the Secretary to transfer the base to Role Models.

The district court denied Role Models's motion for a preliminary injunction, *Role Models Am., Inc. v. White*, 193 F. Supp. 2d 76, 87 (D.D.C. 2002), but we reversed, *see* 317 F.3d 327 (D.C. Cir. 2003). Concluding that the Secretary had violated the clear text of the relevant regulations by failing to provide adequate notice that surplus military property was available, we remanded the case to the district court "with instructions to enter a permanent injunction against conveyance of the Fort Ritchie property until the Government remedies the procedural errors" it had committed. *Role Models*, 317 F.3d at 333–34.

Having secured the relief it sought, Role Models now requests, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 (2000) (EAJA), reimbursement for the attorneys' fees that it incurred in bringing the appeal. The EAJA provides that:

> [A] court shall award to a prevailing party other than the United States fees and other expenses . . . incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States . . ., unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

*Id.* § 2412(d)(1)(A). The government opposes any award of fees, contending that notwithstanding our merits opinion, Role Models is not a "prevailing party." In any event, the government argues, its position was "substantially justified." Even if a fee award is warranted, the government insists, the amount that Role Models requests is excessive. We address each argument in turn.

## II.

The government contends that Role Models is not entitled to a fee award at this point because it has yet to obtain Fort Ritchie. In support, the government relies primarily on *Waterman Steamship Corp. v. Maritime Subsidy Board*, 901

F.2d 1119 (D.C. Cir. 1990), in which we denied EAJA fees to plaintiffs who, although they won a remand directing an agency to correct procedural errors it had made in awarding a contract, failed to obtain an order enjoining the provision of services under the contract. "From a party's viewpoint," we explained, "correct procedures . . . are largely (if not entirely) instruments to a desired end—a change in someone's primary conduct in the real world: relief from a restriction, grant of a benefit, imposition of a restriction on others, etc." *Id.* at 1122. We therefore concluded that an "award of EAJA fees for corrective efforts that yield no real-world benefit would reduce the normal deterrent to litigative nit-picking." *Id.*

*Waterman* is very different from this case. Role Models obtained not only a remand to correct procedural errors, but also an injunction barring the Secretary from transferring Fort Ritchie until he complied with applicable regulations. In other words, Role Models obtained exactly what *Waterman* found missing: "a change in someone's primary conduct in the real world . . . [such as by the] imposition of a restriction on others." *Id.*

This case is much more like *Environmental Defense Fund, Inc. v. Reilly*, 1 F.3d 1254 (D.C. Cir. 1993), a post-*Waterman* case in which we held that the EDF was a prevailing party because it had obtained an order vacating a rule that the EPA promulgated after inadequate notice and comment. We rejected the EPA's argument that because the agency reissued the same rule after proper notice and comment, the EDF did not qualify as a prevailing party. "In the real world of the APA," we said, "an opportunity for comment—which the EDF did get—is not to be denigrated." *Id.* at 1257. That statement applies here as well. Whether or not Role Models eventually acquires Fort Ritchie, the opportunity to compete for it, which Role Models successfully achieved through the injunction—an injunction that was the functional equivalent of vacating the rule in *Reilly*—"is not to be denigrated."

Similarly, in *Grano v. Barry*, 783 F.2d 1104 (D.C. Cir. 1986), we held that a plaintiff had "prevailed" by convincing

the district court to enjoin the demolition of an historic building until a referendum on the demolition had occurred. Although the building was ultimately demolished, that had no effect on our view of the prevailing-party issue because the injunction "had the distinct external effect of postponing the razing of the tavern until the election could be held," and hence "the victory represented a substantial part of what plaintiffs asked the court for in the first place." *Id.* at 1110. The injunction here had a comparable "external effect"— postponing conveyance of Fort Ritchie until the Secretary complies with the relevant regulations—that likewise represents "a substantial part of what plaintiff[ ] asked the court for in the first place."

Nothing in *Thomas v. National Science Foundation*, 330 F.3d 486 (D.C. Cir. 2003), requires a different result. There we held that plaintiffs who had obtained a preliminary injunction were not prevailing parties because they had "filed a lawsuit in order to obtain a refund from NSF, [and] the preliminary injunction did nothing to vindicate that claim." *Id.* at 493. In adopting this reasoning, we distinguished *Grano*, in which the injunction "gave the plaintiffs the precise relief that they had sought." *Id.* The injunction here similarly gave Role Models the precise relief it sought.

## III.

Role Models's status as a prevailing party means that we must determine whether the government's position was "substantially justified." In *Pierce v. Underwood*, 487 U.S. 552 (1988), the Supreme Court held that a position is substantially justified "if a reasonable person could think it correct, that is, if it has a reasonable basis in law and fact." *Id.* at 566 n.2. *Pierce* added that just because the government loses on the merits does not mean that its position lacked substantial justification. *Id.* at 569.

Arguing that its position was substantially justified, the government focuses largely on its litigation position, relying heavily on the fact that it prevailed in the district court. The government, however, must demonstrate the reasonableness

not only of its litigation position, but also of the *agency's* actions, *e.g.*, *Halverson v. Slater*, 206 F.3d 1205, 1208 (D.C. Cir. 2000); *see also* 28 U.S.C. § 2412(d)(2)(D) (providing that "'position of the United States' means, in addition to the position taken by the United States in the civil action, the action or failure to act by the agency upon which the civil action is based"), and here we are convinced that the Secretary's actions were not substantially justified. As explained at greater length in our prior opinion, the applicable regulations provide that the relevant agency—here, the Secretary of the Army—"shall [p]ublish . . . the time period during which [it] will receive notices of interest from . . . representatives of the homeless[ ] *and other interested parties*." 24 C.F.R. § 586.20(c)(1) (2003) (emphasis added); 32 C.F.R. § 176.20(c)(1) (2003) (emphasis added). The mandatory phrasing of these identically worded regulations leaves the Secretary no discretion, while the use of the conjunction "and" indicates in no uncertain terms that the Secretary must make clear that he will receive notices not only from representatives of the homeless, but also from other interested parties. Despite the clarity of these regulations, the Secretary chose to publish a notice entitled "Homeless Assistance Outreach Initiative," and to say in the notice's opening statement that he would "receive Notices of Interest from representatives of agencies that seek to serve the needs of our community's homeless population." The remainder of the notice only bolstered the impression that it was directed exclusively at advocates for the homeless, leaving nothing to indicate to Role Models—an organization with an entirely different mission—that the Secretary was soliciting notices from "other interested parties" as well. Thus, as in *F.J. Vollmer Co. v. Magaw*, 102 F.3d 591 (D.C. Cir. 1996), the agency's position lacked substantial justification because it was "wholly unsupported by the text" of the applicable regulations. *Id.* at 593.

The government cites our decision in *Trahan v. Brady*, 907 F.2d 1215 (D.C. Cir. 1990), to support its argument that an agency's actions may be substantially justified even though a court later concludes that the agency violated its regulations. We conclude here, however, not that the Secretary's violation

of the regulations in and of itself demonstrates the absence of substantial justification, but rather that the regulations were so clear and the Secretary's failure to comply with them so obvious that his actions could not "appear correct to a reasonable person." *Id.* at 1220. Bearing in mind that the hallmark of the substantial justification test is reasonableness, we note, as we did in *Vollmer*, that "[a]lthough the merits panel did not use the word 'unreasonable,' . . . it highlighted the fundamental unreasonableness of the [agency's] position." 102 F.3d at 596. In our merits opinion in this case, we stated that "[w]e cannot imagine how Role Models, an organization devoted to establishing schools for at-risk minors, could possibly have interpreted [this] notice . . . as an invitation to apply for the Fort Ritchie property." 317 F.3d at 332. Nor could we—or can we now—imagine how the Secretary could have viewed this notice as satisfying his obligations under the regulations. That he could not reasonably have done so only underscores the fact that his position lacked substantial justification. Our conclusion, then, "rests primarily on our view, informed by an analysis of the merits panel's opinion, that the case was easy and the [Secretary's] arguments worthy of little credence, as well as on the [Secretary's] failure to offer any convincing reasons for believing that [his] interpretation of [the regulations] was substantially justified." *Halverson*, 206 F.3d at 1212.

## IV.

This brings us to the amount of fees to be awarded. The EAJA authorizes courts to award "reasonable attorney fees." 28 U.S.C. § 2412(d)(2)(A). Role Models seeks compensation for the work of two partners, one counsel, one associate, six legal assistants, one law clerk, two research librarians, and a legislative specialist. Their hourly rates range from $495 for the lead partner to $285 for the associate to $165 for the law clerk. According to Role Models, these fourteen individuals logged a total of 1058 hours in connection with the appeal and with the preparation of its fee petition. Multiplying the appropriate rates and the number of hours, Role Models requests $342,741.25 in legal fees. It also seeks $12,773.44

for expenses, as well as leave to "supplement its Application to reflect the additional fees and expenses incurred while litigating its EAJA application." Appellant's Reply to Appellees' Opp'n to Appellant's Application for Att'ys' Fees and Costs at 1 n.2. Insisting that Role Models's request is "clearly unreasonable," the government urges us to reduce it "drastically." Appellees' Opp'n to Appellant's Application for Att'ys' Fees and Costs at 12.

To resolve this dispute, we consider first the hourly rate and then the number of hours requested. *See Murray v. Weinberger*, 741 F.2d 1423, 1427 (D.C. Cir. 1984) ("The starting point in fee-setting under the statute ... is the number of hours reasonably expended multiplied by a reasonable hourly rate."). Throughout our analysis we will rely on EAJA precedent as well as on case law arising under other fee-shifting statutes. *See, e.g.*, *Indep. Fed'n of Flight Attendants v. Zipes*, 491 U.S. 754, 759 n.2 (1989) (noting that "fee-shifting statutes' similar language is a strong indication that they are to be interpreted alike" (internal quotation marks omitted)).

*Hourly Rates*

The EAJA provides that "attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A)(ii). Role Models seeks compensation at rates above the $125 cap, claiming that higher rates are warranted because of both the presence of special factors and increases in the cost of living.

Role Models contends that a special-factor enhancement is justified by "the quality of representation" that its attorneys provided. *See* Appellant's Application for Att'ys' Fees Under the Equal Access to Justice Act at 11. Specifically, it points to "the effort, expertise, actual time expended by Sidley in this case and the exceptional result obtained." *Id.* Role Models also says the case involved a "complex statutory and regulatory scheme," *id.* at 10, and that its attorneys had to

prepare the appeal in a relatively short period of time because they did not take on the case until after the district court denied a preliminary injunction. Finally, Role Models points out that its attorneys' regular billing rates, which Role Models contends are consistent with those of other large Washington law firms, far exceed the statutory cap. The government argues that none of these factors justifies a special-factor enhancement.

Setting aside that there seems to be nothing particularly "complex" about this appeal—indeed, it appears just the type of garden-variety administrative law matter that large Washington law firms handle routinely—the Supreme Court in *Pierce* explicitly rejected virtually all of the arguments for a special-factor enhancement that Role Models raises in this case. *Pierce* explained that in order to "preserve the intended effectiveness of the [statutory] cap, . . . the other 'special factors' envisioned by the exception must be such as are not of broad and general application." 487 U.S. at 573. After giving examples of acceptable special factors, including knowledge of a foreign language or expertise in "an identifiable practice specialty such as patent law," *id.* at 572, the Court listed several factors that it deemed insufficient to merit an increase in the statutory cap. The Court stated that "[t]he 'novelty and difficulty of issues,' 'the undesirability of the case,' the 'work and ability of counsel,' and 'the results obtained,' are factors applicable to a broad spectrum of litigation; they are little more than routine reasons why market rates are what they are." *Id.* at 573 (citations omitted); *see also id.* at 572 ("We do not think Congress meant that if the rates for all lawyers in the relevant city . . . come to exceed $75 per hour (adjusted for inflation) then that market-minimum rate will govern instead of the statutory cap.").

Only one of Role Models's justifications for a special-factor enhancement is not among those that *Pierce* expressly rejected: that its attorneys had to prepare the appeal in a relatively short period of time. But we think that *Pierce*'s logic renders this consideration insufficient to support a statutory cap increase. *Pierce* made clear that an increase in the cap is

justified only by work requiring specialized skills or knowledge beyond what lawyers use on a regular basis. Producing high-quality work on a short deadline hardly satisfies this standard. While we recognize that Role Models's attorneys did a fine job in securing a favorable result, our experience with the work of many large firms convinces us that Role Models's lawyers were far from the only ones who could have achieved that result under the same time pressure.

We agree, however, that a cost-of-living increase is warranted. As Role Models points out, the cost of living in the Washington, D.C. area, as measured by the Consumer Price Index, has risen approximately 14.6% since Congress imposed the $125-per-hour cap. Role Models argues that the cap should be increased by the same percentage, to $143.25 per hour. The government does not challenge this assertion. We have granted such adjustments in other cases, *see, e.g.*, *Cooper v. United States R.R. Ret. Bd.*, 24 F.3d 1414, 1417 (D.C. Cir. 1994) (per curiam); *Jones v. Lujan*, 887 F.2d 1096, 1101 (D.C. Cir. 1989) (per curiam), and have found no case where we denied one. This is not surprising, as "courts routinely approve cost-of-living adjustments." Gregory C. Sisk, *The Essentials of the Equal Access to Justice Act (Part Two)*, 56 LA. L. REV. 1, 128 (1995). Accordingly, we will increase the cap to $143.25 per hour.

Most of the hourly rates for the non-lawyers, including the legal assistants and the law clerk, fall below this adjusted statutory cap. Role Models has the burden of justifying the rates at which these individuals billed for their time, *see, e.g.*, *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984) ("[C]ourts properly have required prevailing attorneys to justify the reasonableness of the requested rate or rates."), but it has submitted no information about the prevailing market rate for law clerks and legal assistants in the Washington area, nor has it referred to either of the two matrices that we have previously said litigants may rely upon when seeking fees, *see Covington v. District of Columbia*, 57 F.3d 1101, 1107 (D.C. Cir. 1995) ("[P]laintiffs may point to such evidence as an updated version of the *Laffey* matrix [*Laffey v. N.W. Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983)] or the U.S.

Attorney's Office matrix, or their own survey of prevailing market rates in the community."). Role Models has not even taken the basic step of submitting an affidavit detailing the non-attorneys' experience and education. *See In re North (Bush Fee Application)*, 59 F.3d 184, 189 (D.C. Cir. 1995) (per curiam) (finding an affidavit insufficient to meet the petitioner's burden of establishing the reasonableness of its attorneys' hourly rates because the affiant failed to "swear to any knowledge of the qualifications of the particular professionals involved"); *Covington*, 57 F.3d at 1110 (finding the petitioners' burden to justify its rates met where the petitioners "submitted data demonstrating their attorneys' experience in the legal profession and in litigating complex federal court cases, as well as information probative of their attorneys' skill and reputation"). Because Role Models has justified neither the law clerk's nor the legal assistants' requested rates—and thus has failed to carry its burden—we will reduce those rates by twenty-five percent. *See United States ex rel. Averback v. Pastor Medical Assocs.*, 224 F. Supp. 2d 342, 356 (D. Mass. 2002) (reducing two attorneys' requested hourly rates because of "the complete and utter lack of evidentiary support underlying their claimed hourly rate"). Although Role Models has likewise submitted nothing to justify its attorneys' rates, since the adjusted statutory cap reduces those rates by well over twenty-five percent we will make no further reductions.

### *Number of Hours*

Role Models, as mentioned, seeks reimbursement for 1058 hours of work. The government insists that 1058 hours is unreasonable, arguing that several of Role Models's attorneys appear to have repeated each other's work and adding that "[t]his case involved no discovery, did not require any travel, did not require interview of witnesses, or involve multiple pleadings." Appellees' Opp'n at 12. Defending its request, Role Models argues (essentially reiterating its justifications for a special-factor increase in the statutory cap) that the substantial number of hours is reasonable "[g]iven the time parameters and the complexity of the pertinent statutes and

regulations." Appellant's Reply at 7–8. It also states that "the research and writing performed for the appeal was divided by factual and/or legal areas among the attorneys," and that "at no time were there parallel, full-time work efforts." *Id.* at 8 (internal quotation marks omitted).

Role Models has the burden of establishing the reasonableness of its fee request, *see, e.g.*, *North*, 59 F.3d at 189, and "[s]upporting documentation 'must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended,'" *In re Olson*, 884 F.2d 1415, 1428 (D.C. Cir. 1989) (per curiam) (emphases omitted) (quoting *United Slate, Tile & Composition Roofers v. G & M Roofing & Sheet Metal Co.*, 732 F.2d 495, 502 n.2 (6th Cir. 1984)). We agree with the government that the time records Role Models has offered permit no such certainty.

To begin with, many time records lump together multiple tasks, making it impossible to evaluate their reasonableness. *See id.* at 1428–29 ("[W]hen an attorney bill[s] for more than one task in a day, the court is left to approximate the amount of time which should be allocated to each task. With such inadequate descriptions the court cannot determine with a high degree of certainty, as it must, that the billings are reasonable." (footnote and internal quotation marks omitted)). For example, one entry indicates that on September 17 Role Models's lead lawyer spent 10.25 hours performing the following six tasks: "Telecon[ference] with R. Alexander; conference with J. Port, K. Dodd, C. Bonat regarding research; review research; draft brief; review bankruptcy materials; revise brief." Another entry indicates that on October 3 the associate spent 1.25 hours on the following four tasks: "Revise Lis Pendens filing; call bankruptcy attorney (G. Johnson) and leave message; call circuit court regarding procedure for Lis Pendens filing; finalize draft of Lis Pendens filing." Not only do similarly lumped entries appear throughout the time records, but the two we have mentioned include time spent on bankruptcy matters, which have nothing to do with this appeal. Although Role Models says it has deducted

all time spent on bankruptcy matters, the lumping prevents us from verifying that it deducted the proper amount of time.

Many time records also lack adequate detail. *See In re Sealed Case*, 890 F.2d 451, 455 (D.C. Cir. 1989) (per curiam) ("[W]e note numerous instances of documentation and specification that do not adequately describe the legal work for which the client is being billed. This makes it impossible for the court to verify the reasonableness of the billings, either as to the necessity of the particular service or the amount of time expended on a given legal task."). The law clerk's time records, for instance, give an identical one-line entry, "[r]esearch and writing for appellate brief," on eight consecutive weekdays: the clerk billed 8.25, 6.25, 7.25, 8.25, 7.25, 4, 8, and 4.25 hours on those days. Such generic entries are inadequate to meet a fee applicant's "heavy obligation to present well-documented claims." *Kennecott Corp. v. EPA*, 804 F.2d 763, 767 (D.C. Cir. 1986) (per curiam). Similarly inadequate are the numerous entries in which attorneys billed simply for "research" and "writing," or for time spent in teleconferences or meetings—over one hundred in total—the purposes of which are not provided. *See In re Meese*, 907 F.2d 1192, 1204 (D.C. Cir. 1990) (per curiam) (reducing an award because "[t]he time records maintained by the attorneys, paralegals and law clerks are replete with instances where no mention is made of the subject matter of a meeting, telephone conference or the work performed during hours billed"); *Olson*, 884 F.2d at 1428 ("[T]here are multitudinous billing entries, included among other entries for a particular day, that wholly fail to state, or to make any reference to the subject discussed at a conference, meeting or telephone conference.").

Attorneys also billed for time spent dealing with individuals whose roles in the case are never explained. For example, on March 27 one attorney charged over $2000 for time spent performing the following tasks: "Emails with K. Esters of CNS; telecons with R. Alexander; draft letter to Bresee; review public benefit conveyance regs." Who are Bresee and K. Esters? What is their connection to this case? What is CNS? Without answers to these questions, such time entries—of which there are many examples throughout the time

records—are manifestly inadequate. *See In re Donovan*, 877 F.2d 982, 995 (D.C. Cir. 1989) (per curiam) ("[W]e are also compelled to deduct … charges incurred when attorneys held conferences and teleconferences with persons referenced as 'Geiser' and 'Wells.' The application fails to document who these individuals are or the nature of their relationship to the investigation; consequently, we cannot evaluate whether such fees were reasonably incurred.").

The shortcomings in the time records are particularly serious because we have no idea what it was about this case that required an investment of over 1000 hours—nearly six months' worth of forty-hour weeks. Involving no discovery and presenting neither complex nor contested facts, the case presented a straightforward challenge to an agency's failure to comply with its own regulations. Although Role Models rightly observes that its attorneys had to spend time familiarizing themselves with the case, we fail to see how this justifies such a significant number of hours. We appreciate that the attorneys made "substantial efforts … to produce the most polished brief possible, and to be meticulously prepared to respond to the Court's questions at oral argument." Appellant's Application at 10–11. But as we have said, "there is a point at which thorough and diligent litigation efforts become overkill." *Okla. Aerotronics, Inc. v. United States*, 943 F.2d 1344, 1347 (D.C. Cir. 1991).

"Duplication of effort is another basis on which [the] hours seem excessive." *Davis County Solid Waste Mgmt. & Energy Recovery Special Serv. Dist. v. United States EPA*, 169 F.3d 755, 761 (D.C. Cir. 1999) (per curiam). For example, on three separate occasions two individuals, one an associate charging over $200 an hour, billed time for filing the same brief. Similar unexplained duplication of work appears throughout the time records. More generally, Role Models has failed to explain why this relatively straightforward case required the efforts of three senior attorneys, each billing at least $400 per hour. Perhaps something about this case required so many lawyers expending so many hours. But because the time records contain so little information, we have no basis for concluding that hours that appear to be

excessive and redundant are in fact anything other than excessive and redundant. *See In re Espy (Townsend Fee Application)*, 346 F.3d 199, 204 (D.C. Cir. 2003) ("[I]nadequate documentation makes it impossible for the court to verify the reasonableness of the billings, either as to the necessity of the particular service or the amount of time expended on a given legal task." (internal quotation marks omitted)); *see also Murray*, 741 F.2d at 1427 ("[H]ours that are 'excessive, redundant, or otherwise unnecessary' must be excluded. . . ." (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983))).

The time records suffer from two additional defects. First, on a number of occasions one attorney's records indicate that he or she spent time meeting with another attorney, while the second attorney's records report no such meeting. For example, the associate reported that on February 13 she spent 4.5 hours on the following tasks: "Call Clerk's Office for D.C. Circuit regarding Bill of Costs' filing procedure; discuss with P.D. Richardson; read EAJA research." Yet Mr. Richardson billed no time discussing the case with the associate on that day. In fact, Mr. Richardson charged no time at all on February 13. Similarly, on July 16 Mr. Richardson billed for time spent on a "[t]eleconference with J.C. Port," but Mr. Port's time records, though including an entry for discussions with the law clerk, contain no reference to a teleconference with Mr. Richardson. Such unexplained inconsistencies appear throughout the time records.

Second, several time records include tasks that do not warrant reimbursement. For example, Role Models's lead attorney billed for time spent on a "telecon with Herald Mail reporter." In this circuit, the government cannot be charged for time spent in discussions with the press. *See Am. Petroleum Inst. v. United States EPA*, 72 F.3d 907, 913 (D.C. Cir. 1996) (citing *Meese*, 907 F.2d at 1203); *Donovan*, 877 F.2d at 993–94. Role Models's lead attorney also spent time after oral argument "review[ing] summary of argument," "review[ing] cases," and "[r]evis[ing] summary of argument," but Role Models has not explained how these tasks helped it prevail in its appeal. Furthermore, two lumped entries re-

port unspecified amounts of time spent drafting and revising the firm's engagement letter with Role Models. The government should not have to pay for administrative matters relating to the formal relationship between Role Models and its attorneys. Also, a legal assistant logged two hours to "[v]isit Court of Appeals for the D.C. Circuit to obtain copy of Government's brief." Given that the government served its brief directly on Role Models's attorneys, it should not have to pay for this time. Nor should it have to reimburse Role Models for two hours that a partner spent "[c]ompleting application for admission to D.C. Circuit Bar" and fifteen minutes that the associate spent "[r]esearch[ing] admission to D.C. Circuit Bar [and] prepar[ing] application materials" for the partner. Not only do we assume that a Washington law firm offering itself as a specialist in federal court litigation would treat the cost of joining the bar of this court as an expense of doing business not chargeable to clients—much less to the federal government—but this partner did not even participate in the oral argument. *Cf. Miller v. Alamo*, 983 F.2d 856, 862 (8th Cir. 1993) ("The government challenges the Millers' request for reimbursement of the $30 fee for having the Millers' attorney admitted to the Eighth Circuit Bar. We agree that [the relevant fee-shifting statute] should not be used to require the government to fund the enhancement of an attorney's versatility or capability."). Finally, as already mentioned, two individuals—an associate and a legal assistant—spent time filing each of Role Models's briefs. We do not understand why attorney or even legal assistant skills were required for this job. "[P]urely clerical or secretarial tasks should not be billed at a paralegal rate regardless of who performs them." *Missouri v. Jenkins*, 491 U.S. 274, 288 n.10 (1989); *see also Meese*, 907 F.2d at 1203 ("The court . . . deducts those charges by both paralegals and law clerks for such tasks as 'delivering' or 'picking up' various documents. . . . In our view, such tasks are 'purely clerical or secretarial' and thus cannot be billed at paralegal or law clerk rates.").

In view of all this—inadequate documentation, failure to justify the number of hours sought, inconsistencies, and im-

proper billing entries—we will allow reimbursement for only fifty percent of the attorney hours that Role Models requests. *See Hensley*, 461 U.S. at 433 ("Where the documentation of hours is inadequate, the district court may reduce the award accordingly."). A fixed reduction is appropriate given the large number of entries that suffer from one or more of the deficiencies we have described. *See, e.g.*, *Copeland v. Marshall*, 641 F.2d 880, 903 (D.C. Cir. 1980) (en banc) ("[T]he District Court Judge in this case—recognizing, as he did, that some duplication or waste of effort had occurred—did not err in simply reducing the proposed . . . fee by a reasonable amount without performing an item-by-item accounting."); *see also Okla. Aerotronics*, 943 F.2d at 1347 (affirming the district court's flat forty percent reduction in allowable hours). For the four attorneys we will therefore award fees for 410.25 hours, half the 820.5 requested. At the adjusted statutory rate of $143.25 per hour, this comes to $58,768.31. Because the law clerk's time records suffer from the same inadequacies that characterize the attorneys' time records, we will award fees for only half of his hours as well. Reducing the law clerk's hourly rates by twenty-five percent because of Role Models's failure to justify those rates, *see supra* page 11, we will award $8,881.41 for the clerk's time.

The government opposes any recovery for the legal assistants, arguing that a party may not recover fees for work done by non-attorneys. But we have previously affirmed a fee award that "includ[ed] paralegal time." *Okla. Aerotronics*, 943 F.2d at 1352; *see also Olson*, 884 F.2d at 1426 ("This Circuit 'holds that paralegals and law clerks are to be compensated at their market rates.' " (quoting *Donovan*, 877 F.2d at 993 n.20)). It is true, as the government points out, that in a subsequent decision we denied recovery for paralegal work and in doing so cited a Fifth Circuit decision deeming such time to be an "unrecoverable overhead expense." *See Democratic Cent. Comm. v. Wash. Metro. Area Transit Comm'n*, 12 F.3d 269, 272 (D.C. Cir. 1994) (per curiam) (citing *Allen v. United States Steel Corp.*, 665 F.2d 689, 697 (5th Cir. 1982)). In that case, however, we denied reimbursement for paralegal fees because the purpose of the paralegal's work was "not

sufficiently specified." *Id.* Here, by contrast, the legal assistants' time records, unlike the attorneys' and the law clerk's, provide adequate detail and show that these employees performed suitable tasks. We will therefore award reimbursement for the full number of hours requested for the legal assistants' time, with the exception of the two hours that a legal assistant spent visiting this court to pick up a brief and the time that a legal assistant spent on three separate occasions filing a brief. *See supra* page 16. As to the latter, the entries for two of the three occasions are lumped, leaving us unable to determine exactly how much time the legal assistant actually spent filing the brief. Because the single "unlumped" entry shows that the legal assistant spent 0.75 hours, we will use that figure for all three. Reducing the legal assistants' hourly rates by twenty-five percent because of Role Models's failure to justify those rates, *see supra* page 11, we will award $4,147.51 for the work of the six legal assistants.

The government argues that the EAJA does not permit the government to be charged for the work of the research librarians and the legislative specialist. We need not consider that issue, however, for we think Role Models has failed to overcome the assumption that "work done by librarians, clerical personnel and other support staff . . . [is] generally considered within the overhead component of a lawyer's fee." *Olson*, 884 F.2d at 1426–27. Role Models has not, for example, shown that law firms in Washington customarily bill clients for such services, or even that its own attorneys customarily bill for them.

### *Expenses*

Role Models seeks $12,773.44 for expenses, having properly excluded several categories—such as messenger services and ground transportation—that we have deemed non-reimbursable. *See Mass. Fair Share v. Law Enforcement Assistance Admin.*, 776 F.2d 1066, 1069 (D.C. Cir. 1985) (per curiam). Role Models should also have excluded "overtime services," *see, e.g.*, *Michigan v. United States EPA*, 254 F.3d

1087, 1096 (D.C. Cir. 2001), and we will deny recovery for those services. We will also deny recovery for search service expenses, document delivery services, and publications because Role Models has failed to explain what these categories comprise.

Although the rest of the expense categories are properly chargeable to the government, Role Models appears to ask for more than it incurred. For example, although its attorneys billed Role Models $9,448.89 for their use of Westlaw, Role Models requests $10,027.08. Similar discrepancies occur with Lexis expenses ($311.82 billed to Role Models versus $323.17 requested), copying charges ($1,678.06 billed to Role Models and not already reimbursed versus $1,716.34 requested), and search services expenses ($433.47 billed versus $578.07 requested). With each discrepancy we will award the lower, billed, amount (except for search services, which we have said we will deny entirely). The government urges us to deny any recovery for computer-research charges, but we decline to do so because such services presumably save money by making legal research more efficient. *See Hirschey v. FERC*, 777 F.2d 1, 6 (D.C. Cir. 1985) (finding that "a charge . . . for computer research is appropriate").

We will therefore award a total of $11,438.77 in expenses: $1,678.06 for copying plus $311.82 for Lexis plus $9,448.89 for Westlaw.

## V.

In highlighting the shortcomings of the time records submitted in this case and in reducing Role Models's fee request, we emphasize that we make no judgment either about the propriety of Role Models's decision to pay its attorneys for the services for which it now seeks reimbursement or about the attorneys' billing Role Models for those services. To begin with, the EAJA and relevant case law limit, or in some instances entirely prohibit, recovery for certain services that law firms routinely and properly bill clients. More important for purposes of our analysis here, law firms may well have understandings with clients and a level of trust that permit

billing on the basis of time records like those at issue here. In awarding fees under the EAJA, however, we have a special responsibility to ensure that taxpayers are required to reimburse prevailing parties for only those fees and expenses actually needed to achieve the favorable result. In fulfilling that responsibility, "we are not prepared to hold that the willingness of a private client to pay a bill necessarily demonstrates that the charge was reasonable under the statutory definition and can therefore be automatically assessed against the government." *Kennecott Corp.*, 804 F.2d at 767. That said, "we do not intend to tar [petitioner's law firm] . . . with any brush of over-billing or over-staffing as related to their relationship with this or any other client. We simply conclude that the petitioner has not sufficiently justified the degree of staffing . . . to bring it within the zone of reasonableness contemplated by Congress. . . ." *North*, 59 F.3d at 193.

In sum, we will award Role Models $83,236: $58,768.31 in attorneys' fees plus $8,881.41 for the law clerk plus $4,147.51 for the legal assistants plus $11,438.77 for expenses. Role Models's request for leave to supplement its application is denied.

*So ordered.*