UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 20-8342(E)

ROBERT L. STINSON, APPELLANT,

V.

DOUGLAS A. COLLINS,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

Before GREENBERG, TOTH, and FALVEY, *Judges.*

**O R D E R**

FALVEY, *Judge*, filed the opinion of the Court. TOTH, *Judge*, filed a dissenting opinion.

At first glance, this matter appears "beset with a labyrinth of whims and caprices, which [forever present] new difficulties and impediments" involving discretion, jurisdiction, factfinding, and remands. WASHINGTON IRVING, *The Legend of Sleepy Hollow*, *in* THE SKETCH-BOOK OF GEOFFREY CRAYON, GENT. 303, 313-14 (1820). Indeed, both parties attempt to explain that one or more of these issues would resolve this dispute over an Equal Access to Justice Act (EAJA) application in their favor. Yet, after mapping this labyrinth of false complexity, we find that the matter rests on clear reasoning from the Federal Circuit that faults the Board for an error it made when denying service connection. That court commands our actions, not the other way around. Given the Federal Circuit's conclusion that the Board erred in the case underlying this matter, the veteran must be eligible to receive an EAJA award for his appellate victory.

**I. AN AUSPICIOUS APPEAL**

Before resolving a variety of counterfeit complications the parties drape over the case, we must first rehearse the substratal issues and appellate ratiocinations that delivered us here. According to his service treatment records, Robert L. Stinson experienced a rash on his neck during his time in the Army. *Stinson v. McDonough*, No. 20-8342, 2022 WL 3152344, at *4-5 (Vet. App. Aug. 8, 2022). Many years after his service concluded, Mr. Stinson found a skin lesion on his shoulder, which was then diagnosed as blastic plasmacytoid dendritic cell neoplasm (BPDCN). *Id.* at *2. That condition is unfortunately a rare and aggressive form of cancer characterized in part by the appearance of such skin lesions. Shai Shimoni, et al, *Blastic Plasmacytoid Dendritic Cell Neoplasm: 2025 Update on Diagnosis, Pathophysiology, Risk Assessment, and Management*, 100 AM. J. OF HEMATOLOGY 1408, 1409 (2025).

Mr. Stinson filed a claim for service connection for his BPDCN, which began his odyssey through the VA system. One remand and one VA medical opinion into this journey, the Board of Veterans' Appeals denied service connection because it found that "the evidence weighs against finding that an in-service injury, event, or disease occurred." Record (R.) at 9; *see Shedden v.*

*Principi*, 381 F.3d 1163, 1166-67 (Fed. Cir. 2004) (requiring an in-service incurrence or aggravation of a disease or injury to prove service connection). Mr. Stinson appealed, averring that the Board erred in three ways: (1) by failing to discuss favorable evidence, including the service treatment records; (2) by relying on an exam that did not address that same evidence; and (3) by failing to seek clarification of a private opinion. *Stinson*, 2022 WL 3152344, at *4-5.

In a single-Judge decision, we found those arguments unpersuasive and affirmed the Board's denial. Responding to the first two of Mr. Stinson's contentions, we determined that the service treatment records were irrelevant to the issue of service connection because the rash noted therein did not appear in the same place as the BPCDN skin lesion. *Id*. We also explained that it was unnecessary for the Board to seek any clarification of the evidence because the conditions under which a clarification is required were not met. *Id*. at *3 (citing *Carter v. Shinseki*, 26 Vet.App. 534, 545 (2014) (laying out the prerequisites under which the duty to clarify applies)). Mr. Stinson disagreed and appealed, again arguing that the VA exam and the Board's decision were "inadequate because both failed to address . . . his in-service symptoms." *Stinson v. McDonough*, 92 F.4th 1355, 1359 (Fed. Cir. 2024).

This third appeal succeeded; the Federal Circuit remanded Mr. Stinson's claim for further development. It determined that our decision engaged in a misadventure of factfinding concerning the service treatment records and impermissibly weighed that evidence in the first instance. *Id*. at 1361-62 (citing *Tadlock v. McDonough*, 5 F.4th 1327, 1337 (Fed. Cir. 2021) (holding that "[w]hen questions of fact are open to debate, veterans are entitled to present whatever arguments and evidence they have" to the Board)). Because neither the Board nor a medical expert discussed the records, the Federal Circuit instructed us to remand the matter to the Board "for further factual development" consistent with their opinion.[1] *Id*. at 1364. We then followed the Federal Circuit's directive. *See Stinson v. McDonough*, No. 20-8342, 2024 WL 1953591 (Vet. App. May 3, 2024) (mem. dec.).

This brings us to the application we review today. Under the EAJA, a court may award reasonable fees and expenses to a prevailing party in any civil action against the United States or its agencies. 28 U.S.C. § 2412(d); *Scarborough v. Principi*, 541 U.S. 401, 405 (2004). Mr. Stinson requested an award of $79,697.39 for the attorney fees and expenses he incurred during his appeal.[2] July 30, 2024, Application for Attorney Fees and Expenses (EAJA Application). The Secretary, however, not only contests this amount as unreasonable, but also contends that Mr. Stinson is unable to qualify for an EAJA award under the statute.[3] Secretary's EAJA Response (Resp.) at 5-6. For the reasons that follow, we disagree with that asseveration. But although Mr. Stinson is

---

[1] That court did not consider Mr. Stinson's arguments concerning the clarification of the private medical opinion. *Id*. at 1360 n.3. We also note that the record shows that Mr. Stinson experienced various symptoms in 2002, but that the Federal Circuit determined that any argument about those other symptoms was forfeited by the veteran. *Id*. at 1362 n.5 (citing *Evans v. Bldg. Materials Corp. of Am.*, 858 F.3d 1377, 1382 (Fed. Cir. 2017)). The court's discussion was limited to the service treatment records.

[2] Mr. Stinson originally asked for an award of $80,112.78 but has since conceded that he incorrectly calculated the paralegal billing rate. Appellant's EAJA Resp. at 24. The amount in question is thus $79,697.39.

[3] The parties do not dispute that Mr. Stinson's net worth did not exceed $2,000,000 at the time the civil action was filed, *see* § 2412(d), or the reasonableness of the attorneys' hourly rates.

2

entitled to an EAJA award, we find that he is not entitled to the full amount he requested in his application and subsequent briefing.

## II. INEXISTENT INTERDICTION

Before discussing eligibility, however, we must address Mr. Stinson's assertion that the Federal Circuit's fiat forecloses our consideration of the issue altogether. Pointing to the final section of their decision, he interprets the words "[c]osts for Mr. Stinson" to mean that the court already found him eligible for an award. Appellant's EAJA Reply Brief (Br.) at 17 (citing *Stinson*, 92 F.4th at 1364). If this is true, we would not need to examine eligibility because we would be bound by the higher court's ruling on the subject.

After initially making an estoppel argument reflecting this point, he reversed course and said that it is instead the "law of the case" that precludes the Court from conducting an eligibility analysis. Appellant's Supplemental Br. at 9-10. We agree that the latter doctrine is more applicable to this matter than is some form of estoppel. *See* Joan Steinman, *Law of the Case: A Judicial Puzzle in Consolidated and Transferred Cases and Multidistrict Litigation*, 135 U. PA. L. REV. 595, 598 n.8 (1987) (explaining that estoppel "prevents litigation of the same issues in successive suits" whereas the law-of-the-case doctrine applies when "issues once decided in a case recur [or are reconsidered] in the later stages of the same case").

Although the law-of-the-case doctrine requires lower courts to "follow the rulings of an appellate court," it does not prevent them from reviewing unexamined issues or findings in the given case. *Exxon Corp. v. United States*, 931 F.2d 874, 877-78 (Fed. Cir. 1991); *Hudson v. Principi*, 260 F.3d 1357, 1364 (Fed. Cir. 2001); *see* Steinman, *Law of the Case*, at 603. The Federal Circuit did not purport to opine on Mr. Stinson's EAJA eligibility in its decision. Nor did it implicitly decide the matter by discussing either the requirements of such eligibility or the reasonability of any fees or expenses. *Cf. Jones v. United States*, 125 F.3d 1418, 1426 (11th Cir. 1997) (finding that an order denying an EAJA award did not implicitly prove that the government was substantially justified in their position when that order failed to discuss that issue). Because the question of Mr. Stinson's eligibility for an award contributed nothing to the merits of the Federal Circuit's decision, the law-of-the-case doctrine does not compel us to resolve this matter one way or another. *See Exxon Corp.*, 931 F.3d at 877.

Also trenchant is the principle that higher courts like the Federal Circuit are not generally charged with making the first determinations of a party's EAJA eligibility; inferior courts are the appropriate tribunals for such an inquiry. *See Dole v. Phoenix Roofing, Inc.*, 922 F.2d 1202, 1205 (5th Cir. 1991) (en banc); *Rose v. U.S. Postal Serv.*, 774 F.2d 1355, 1363-64 (9th Cir. 1984). The Federal Circuit's decision in *Halpern v. Principi*, 313 F.3d 1364 (Fed. Cir. 2002), is illustrative of the idea. There, the government asked that court to hold that a veteran who received a remand order was not a prevailing party. *Id*. at 1369. The Federal Circuit, however, explained that "the ultimate conclusion of whether a party prevailed in an action is one of law based on findings of fact." *Id*. Because the court could not review our application of law to fact under its jurisdictional statute, *see* 38 U.S.C. § 7292(d)(2), it could not decide that issue, *Halpern*, 313 F.3d at 1369.

3

The same principle applies in this case. Notwithstanding the fact that the Federal Circuit did not discuss the issue of EAJA eligibility in its decision, doing so would likely have exceeded its jurisdiction. This Court had not resolved these mixed questions—including the eligibility question—before the circuit court decided the underlying merits issue. *See Stinson*, 2024 WL 1953591. Thus, deciding the EAJA matter during the substantive appeal would be an ultracrepidarian exercise by the Federal Circuit. Without a reason to think otherwise, we doubt that the decision above stealthily engaged in such a praxis, especially when reprimanding this Court for two comparable actions. *See Tadlock*, 5 F.4th at 1337; *Halpern*, 313 F.3d at 1369. Our function is to make an initial decision regarding veterans' EAJA applications; if Mr. Stinson disagrees with our decision, he may appeal and take his chances with the Federal Circuit. *See Halpern v. Principi*, 384 F.3d 1297, 1301 (Fed. Cir. 2004); *Jones v. Brown*, 41 F.3d 634, 637 (Fed. Cir.1994). We next confront the question of Mr. Stinson's eligibility to receive an award.

### III. EVIDENT ELIGIBILITY

The EAJA is one of several fee-shifting statutes that permit victorious civil claimants to collect the costs of litigation—including attorney fees and expenses—from the federal government rather than bear those costs themselves. *Scarborough*, 541 U.S. at 404-05. But before Mr. Stinson may take advantage of that statute, we must find that he satisfies two prerequisites: that he is a prevailing party and that the Secretary was not substantially justified in his litigation positions. *See Comm'r, Immigr. & Naturalization Serv. v. Jean*, 496 U.S. 154, 161-63 (1990). Lost within the many arguments Mr. Stinson advanced about these requirements, the Secretary "tightened the knot of confusion into perfect misunderstanding" and argued that neither prerequisite was satisfied. *Cf.* T.S. ELIOT, THE FAMILY REUNION 21 (1939). The resolution of the underlying appeal, however, was simple: one allegation of administrative error was implicitly accepted by the Federal Circuit and sent back for correction by the Agency. And that is all that is required to establish eligibility for an EAJA award.

#### A. Mr. Stinson Prevails

Because "liability on the merits and responsibility for fees go hand in hand," it makes sense that only a "prevailing party" should be eligible under a fee-shifting statute. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). The Supreme Court states that claimants are prevailing parties "'if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'" *Hensley (C. Duane) v. Eckerhart*, 461 U.S. 424, 433 (1983) (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 278-279 (1st Cir. 1978)). If Mr. Stinson is a prevailing party, he must have therefore obtained "at least some relief on the merits of his claim" such that the relationship between him and the Secretary was "'materially altered'" by the litigation. *See Farrar v. Hobby*, 506 U.S. 103, 111 (1992) (quoting *Tex. State Teachers Ass'n. v. Garland Indep. School Dist.*, 489 U.S. 782, 793 (1989)). We tackle these two requirements for prevailing party status in turn.

#### 1. Administrative Error

Remand orders do not generally prove "relief on the merits" because those orders are not dispositive of the ultimate claim. *See Shalala v. Schaefer*, 509 U.S. 292, 300-01 (1993) (discussing Social Security benefits). Still, remands to an agency provide sufficient relief on the merits because

4

"[a]n appeal of an agency decision is treated as a separate proceeding from the administrative proceeding." *Dover v. McDonald*, 818 F.3d 1316, 1318 (Fed. Cir. 2016). The Federal Circuit explained that, when a claimant "secures a remand requiring further agency proceedings because of alleged error by the agency," the claimant qualifies as a prevailing party "without regard to the outcome of the agency proceedings where there has been no retention of jurisdiction" by the remanding tribunal. *Former Emps. of Motorola Ceramic Prods. v. United States*, 336 F.3d 1360, 1366 (Fed. Cir. 2003); *Davis v. Nicholson*, 475 F.3d 1360, 1364 (Fed. Cir.2007). A qualifying remand order may be either implicitly or explicitly based on administrative error. *Robinson v. O'Rourke*, 891 F.3d 976, 980-81 (Fed. Cir. 2018).

Over the years, this Court and the Federal Circuit have been careful not to confer prevailing party status upon a veteran following a remand that did not find Board error. *See Davis*, 475 F.3d at 1364; *Akers v. Nicholson*, 409 F.3d 1356, 1359 (Fed. Cir. 2005); *Vaughn v. Principi*, 336 F.3d 1351, 1360 (Fed. Cir. 2003). The Secretary asks that we act as gatekeeper once again, arguing that the remand here was based on judicial error and discretion, not on an administrative error by the Board. Secretary's Reply Br. at 6-17. To faithfully do so, we adopt a holistic understanding of the underlying decision, including both the remand instructions and their surrounding circumstances. *See Davis*, 475 F.3d at 1365 ("[A]gency error is not limited to the four corners of the Remand Order.").

Our May 2024 single-Judge decision remanded Mr. Stinson's case "for further factual development and readjudication consistent with the Federal Circuit's decision." *Stinson*, 2024 WL 1953591 at *2. And the Federal Circuit's antecedent disposition directed us to remand to the Board "for further factual development consistent with this opinion, *including whether Mr. Stinson's in-service symptoms support a manifestation of BPDCN.*" *Stinson*, 92 F4th at 1364 (emphasis added). Because it remains the controlling authority, we search the Federal Circuit's remand instructions and reasoning (rather than our own) to find any implication of Board error.

But we get ahead of ourselves, for we must first grapple with the law of discretionary remands before we can consider the presence of such an error. According to the Secretary, the Federal Circuit's remand order could not implicate administrative error because Mr. Stinson's arguments were made for the first time before this Court. Secretary's Br. at 14-16; *Stinson*, 92 F.4th at 1359 (observing that Mr. Stinson's arguments were newly raised and may therefore be rejected under the doctrine of issue exhaustion). Our analysis surely stalls if he is correct; a discretionary remand does not confer prevailing party status on a claimant. *See Robinson*, 891 F.3d at 982, 983. Although the Federal Circuit discussed that Mr. Stinson's arguments were newly raised ones, its discussion was limited to reiterating that choosing to address a new argument does not allow us to "find facts or weigh evidence in the first instance when entertaining a newly raised issue." *Stinson*, 92 F.4th at 1363. It therefore falls on this Court to determine the nature of the remand.

Discretionary remands occur after the Court chooses to consider a newly raised issue and decides to return the case to the Board as a result of that issue. Just because we are the first to hear an argument, however, does not always mean that our resultant remand is discretionary. Only if neither the claimant nor the record raised the issue to the Board do we have the discretion to not hear the new argument about that issue. *Id*. Put differently, the axiomatic legal requirement that the Board must address all issues raised by the claimant or reasonably raised by the record remains

5

in play. *See Robinson v. Peake*, 21 Vet.App. 545, 552-53 (2008), *aff'd sub nom. Robinson v. Shinseki*, 557 F.3d 1355 (Fed. Cir. 2009). While we caution the Board not to insert itself into new arguments abandoned by counsel, *see Massie v. Shinseki*, 25 Vet.App. 123, 131 (2011), we do not treat issues reasonably raised by the record as truly "new" for purposes of issue exhaustion, *see Robinson*, 21 Vet.App. at 552-53. The Board still errs by not addressing such a theory, and a remand from the Court that alleviates the administrative error is not considered discretionary.

Looking past the four corners of the Federal Circuit's remand, *see Davis*, 475 F.3d at 1365, we find that the court's reasoning implied that the Board failed to discuss an issue reasonably raised by the record, *see Robinson*, 891 F.3d at 980-81. To be sure, the court faulted us for finding facts and weighing the evidence in the first instance regarding the newly raised arguments; correcting that mistake could not provide Mr. Stinson with relief on the merits. *Stinson*, 92 F.4th at 1362. But the court's reasoning went further, making a finding separate from the one regarding judicial error.

In its decision, the Federal Circuit said that the BPDCN lesion located on Mr. Stinson's upper back "may have overlapped with the back of his neck," which was the location of rash noted in the service treatment records. *Id*. at 1361. For that reason, our finding that the two symptoms materialized in separate locations was, in fact, "open to debate" such that it was impermissible to confidently say in which location the lesion giving rise to Mr. Stinson's BPDCN first emerged. *Id*. (citing *Tadlock*, 5 F.4th at 1337). This reasoning leaves little doubt that the circuit court endorsed the theory that Mr. Stinson's BPDCN lesion on his upper back might have overlapped with the in-service rash on the back of his neck. It even flagged the Board's need to address that theory as a consideration separate from the issue of impermissible adjudication from this Court. *Id*. at 1361-63.

From that reasoning follows the implicit and inevitable conclusion that the Federal Circuit believed that the question concerning the relative location of the two lesions was reasonably raised by the record. Moreover, the court's characterization of the service treatment records as evidence "open to debate" indicates that one view of those records would be favorable to Mr. Stinson. *See id*. at 1361-62. We thus read the Federal Circuit's decision as assigning some fault to the Board for failing to consider that evidence, as it was charged with doing. *See id*.; *Estevez v. McDonough*, 36 Vet.App. 157, 174 (2023) (explaining that the Board must discuss all evidence potentially favorable to the veteran) (citing *Caluza v. Brown*, 7 Vet. App. 498, 506 (1995), *aff'd per curiam*, 78 F.3d 604 (Fed. Cir. 1996) (table)). Because this central issue was reasonably raised by the record, the Board's failure to discuss the records constituted administrative error despite the procedural posture of these arguments. *See Robinson*, 21 Vet.App. at 552-53. And, for that reason, we understand Mr. Stinson to have achieved relief on the merits of his appeal.

To reemphasize: the Secretary is correct when he interprets the thrust of the decision above as being about the error we committed by resolving disputed factual questions in the first instance. We also accept that the focus of the decision was on our inability to exceed our statutory jurisdiction when choosing to address a newly raised argument. But reading the decision as only chiding this Court disregards the Federal Circuit's specific findings concerning the in-service symptoms noted in the record, especially the finding that the location of Mr. Stinson's BPDCN lesion could have overlapped with his in-service rash. *See Stinson*, 92 F4th at 1361. As we explained, that finding showed that the issue involving the lesion's location was reasonably raised

by the record and was therefore not a newly raised issue. *See Robinson*, 21 Vet.App. at 552-53. And by relaying how one view of the service treatment records could support Mr. Stinson's claim rather than simply pointing out that the location of the lesion was in dispute, the Federal Circuit also made an implicit finding that the Board failed to address potentially favorable evidence. *See Caluza*, 7 Vet. App. at 506.

The dissent reminds us of the Federal Circuit's jurisdictional limitations. *See post* at 14-16. This Court's jurisdiction, however, is also limited; we review decisions by the Board, not decisions by the Federal Circuit. 38 U.S.C. §§ 7252, 7292. Indeed, even if the Federal Circuit made a mixed finding of law and fact, "an inferior court has no power or authority to deviate from the mandate issued by an appellate court." *Briggs v. Penn. R. Co.*, 334 U.S. 304, 306 (1948) (citing *Himley v. Rose*, 9 U.S. (5 Cranch) 313, 317 (1809)). No matter whether or not the Federal Circuit could have engaged in factfinding concerning the location of Mr. Stinson's in-service rash and whether one view of that location could favor Mr. Stinson, its decision made clear that it did exactly that. *See Stinson*, 92 F4th at 1361-62. And we are bound by the terms of that opinion. *See Kovacs v. United States*, 739 F.3d 1020, 1024 (7th Cir. 2014) ("The lower court is bound, through the mandate rule, to the resolution of any points that the higher court has addressed."). Of course, it is possible that we misunderstood the Federal Circuit's decision to discuss the Board's statutory obligations separately from our own, and that court could set us straight should the opportunity arise on appeal. *See* 38 U.S.C. § 7292.

To be clear, this is not a concession that the Federal Circuit erred in its factfinding. If we look at the circuit court's discussion as determining that there was sufficient evidence in the record to reasonably raise the issue of the rash's location to the Board as a matter of law, its conclusion is less jurisdictionally suspicious. *See Thomas v. McDonough*, 97 F.4th 850, 853-54 (Fed. Cir. 2024); *Kelly*, 463 F.3d at 1352-53 (holding that the Federal Circuit can decide questions as a matter of law). Consistent with that view, the court could hold that the remand order was not discretionary and that the Board erred by not discussing the evidence, all while staying within the confines of its jurisdiction. *See Robinson*, 21 Vet.App. at 552-53. And that outlook makes sense after reading the decision above; only after the court detailed the open question concerning the location of the in-service rash did they continue, chastising us for our initial factfinding and weighing of evidence. *See Stinson*, 92 F4th at 1361-63.

Ours is not to question why. A perlustration of the Federal Circuit's decision shows that it discovered a view of the service treatment records that supported Mr. Stinson's case and that the Board needed to address the matter. Thus, the circumstances surrounding the remand order implicitly assigned some error to the Board for its failure to discuss that evidence. *See Robinson*, 891 F.3d at 983 (explaining that the remand order in that case could not have explicitly found agency error given jurisdictional limits and then finding that the remand *also* had no implicit findings of error). Because the contours of the circuit court's remand implied that finding of administrative error, we conclude that Mr. Stinson achieved relief on the merits of his appeal and thereby advances one step closer to his EAJA award.

7

## 2. Material Alteration

We now turn to the second prong of the "prevailing party" inquiry, which requires that the Federal Circuit's decision and our later remand must modify "the defendant's behavior in a way that directly benefits the plaintiff." *Farrar v. Hobby*, 506 U.S. 103, 111-12 (1992). The Supreme Court has held that "enforceable judgments on the merits" create the material alteration required to order an EAJA award. *Buckhannon*, 532 U.S. at 604; *see Former Emps. of Motorola Ceramic Prods. v. United States*, 336 F.3d 1360, 1364 (Fed. Cir. 2003). And the Federal Circuit explained that "where the plaintiff secures a remand requiring further agency proceedings because of alleged error by the agency, the plaintiff qualifies as a prevailing party" no matter the outcome if the court does not retain jurisdiction. *Motorola*, 336 F.3d at 1364.

Under this rubric, the relationship between VA and Mr. Stinson materially changed when this Court and the Federal Circuit required the Agency to further develop its facts by considering evidence of in-service symptoms. This is because Mr. Stinson is now able to rely on the Federal Circuit's and our remand order for new proceedings and the consideration of certain evidence. *See Farrar*, 506 U.S. at 113. And unlike in many cases where there is no material change in the legal relationship, this case happened on the merits and resulted in a judicially sanctioned and enduring decree. *See Lackey v. Stinnie*, 604 U.S. 192, 202  (2025) (holding that the overturning of directed verdicts and discovery orders, a declaratory judgment which had no effect, and a 42 U.S.C. § 1988 judgment that was mooted did not materially change a legal relationship).

In other words, the material alteration requirement is met because the Agency is now required to take an action it would not have done without the litigation—consider evidence of Mr. Stinson's symptoms before 2011. *See Hewitt v. Helms*, 482 U.S. 755, 761 (1987). Although the ultimate question of whether there was evidence of an in-service incurrence of his condition such that service connection may be granted has not been resolved at this stage, the Federal Circuit explained that the action produced by the judgment is further agency proceedings over which we lose jurisdiction after the remand (as we have done after carrying out the remand order). *See Motorola*, 336 F.3d at 1364.

### B. Unjustified Positions

The burden now shifts to the government to show that the Secretary's position during the administrative and appellate levels was substantially justified. *See* 28 U.S.C. § 2412(d)(2)(D); *Locher v. Brown*, 9 Vet.App. 535, 537 (1996). Under Supreme Court precedent, the government must show that its position "has a reasonable basis in law and fact." *Pierce v. Underwood*, 487 U.S. 552, 565, 566 n. 2 (1988). In *Stillwell v. Brown*, 6 Vet.App. 291, 302 (1994), we articulated a test to aid in our application of *Pierce* and Federal Circuit caselaw: our determination should be "based upon the totality of the circumstances, including merits, conduct, reasons given, and consistency with judicial precedent and VA policy with respect to such position, and action or failure to act, as reflected in the record on appeal and the filings of the parties."

Our analysis above essentially resolves this question in favor of Mr. Stinson's application. At the administrative stage, the Board was required to address all potentially favorable evidence. But the Board failed to meet this requirement; the service treatment records contained potentially

8

favorable evidence of symptoms that occurred in service and that evidence was not discussed by the Board. Because the Board was required as a matter of law to discuss such evidence, the Secretary's position at the administrative level was unjustified: it contradicted precedent and VA's statutory directives, resulting in an inadequate statement of reasons or bases.

## IV. AN ACCEPTABLE AWARD

Given that EAJA awards shift costs to the taxpayers, we have a "special responsibility" to award claimants "only those fees and expenses actually needed to achieve the favorable result." *Role Models Am., Inc. v. Brownlee*, 353 F.3d 962, 975 (D.C. Cir. 2004); *Smith v. McDonough*, 995 F.3d 1338, 1344 (Fed. Cir. 2021). The Secretary argues that we should use our discretion in awarding fees and expenses to reduce the award to about $31,845.00. Secretary's EAJA Resp. at 30; *see Baldridge v. Nicholson*, 19 Vet.App. 227, 223 (2003).

When calculating attorney fees under this standard, we will only compensate a party for the time an attorney spent on activities for which a private client would customarily be billed. *Oliveira v. United States*, 827 F.2d 735, 744 (Fed. Cir. 1987). Our barometer for measuring EAJA reasonableness is articulated by a test formulated in our decision in *Andrews*: (1) are the hours facially unreasonable; (2) do the factors set out in *Hensley* or *Ussery v. Brown*, 10 Vet.App. 51, 53 (1997), support the application;[4] and (3) are they convincingly opposed by the Secretary? 17 Vet.App. at 321. "Although some factors might theoretically collide or blend, each might stand out to a reviewing court as a reason to reduce or grant an EAJA award in practice." *Duckett v. Collins*, __ Vet.App. __, 2025 WL 3153376, at *6 (Nov. 12, 2025). The descriptions of the logged hours are sufficiently specific for us to review for the Secretary's arguments targeting duplicative or unnecessary billing. *See Andrews*, 17 Vet.App. at 321. The Secretary additionally disputes the reasonableness of the number of hours Mr. Stinson's attorneys spent on certain activities, which we likewise review below.

### A. The Work of Multiple Attorneys

We first consider whether a reduction is warranted because tasks were discussed by or completed by Mr. Stinson's team of 11 lawyers. "[I]n a case with multiple counsel, each counsel may be allowed fees under EAJA based on the distinct contribution of that individual counsel." *Baldridge*, 19 Vet.App. at 237 ("[T]he application must demonstrate that multiple lawyers are not unreasonably doing the same work."). To aid our determination of whether a reduction is needed,

---

[4] The 12 *Hensley* factors are:

(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

461 U.S. at 430 n. 3. And the distinct *Ussery* factors are whether the hours (1) were duplicative; and (2) were there attorney hours for jobs that could have been performed by non-attorneys. 10 Vet.App. at 53.

the *Baldridge* court offered several factors to consider: "(1) the complexity of the case, (2) the need for specialized knowledge, (3) whether the case presents an important issue of first impression, (4) the magnitude of the tasks involved in the litigation, and (5) identification of the specific and distinct tasks assigned to each lawyer." *Id*. at 237-38. The fifth factor in this analysis is especially helpful when conducting our review.

The Secretary particularly focuses on several aspects of the legal operation, starting with the oral argument preparation. As discussed below, such preparation necessarily requires practice and communication with colleagues to simulate and anticipate an actual argument in the Federal Circuit. But some work from four relatively uninvolved attorneys seems to duplicate work of the attorney shepherding the arguing attorney through the process. *See id*. Thus, a marginal reduction for a duplication of work regarding oral argument work is in order, particularly because the lead attorney has experience in litigating veterans' claims.

Next, the Secretary asserts that a range of hours the attorneys spent emailing one another were duplicative. His explanation that it is unclear what tasks each attorney was responsible for, however, is not further elaborated. And the application specifies the subject matter of those emails and communications, many of which concerned the principal attorneys on the case and dealt with legal research and appellate strategy, which are tasks that we should expect attorneys to discuss and clarify together at these stages of litigation, so long as each attorney adds some value to the discussion. Without a better argument as to why these exchanges are unreasonable, we will not seriously reduce the EAJA award on this basis. *See Ussery*, 10 Vet.App. at 54.

That said, at various points throughout the exchanges listed in the application, it seems that one attorney charges more time for certain email exchanges than a different attorney. *See, e.g.*, EAJA Application at xiii, xvi, xvii. This is worrying because the application fails to explain the roles the two attorneys have such that this discrepancy was reasonable, and so we will consider a slight reduction to offset the few hours encompassed by this unexplained discrepancy. Similarly, multiple attorneys edited the briefing before the Federal Circuit; the application did not describe why multiple attorneys needed to provide edits to a draft brief or how each one contributed to the editing process. Thus, a small reduction will be imposed due to this issue. *See id*. at iv-vi.

Although employing a team of attorneys is not generally unreasonable, there is evidence to suggest that some duplicity and unreasonable billing took place, especially when the *Baldridge* factors are applied. Aside from the specific instances described above, we should note that the issues in this appeal are commonplace in VA litigation, that (aside from the EAJA application) this does not concern an issue of first impression, and that there were times where the application could have been more specific regarding the role of each billing attorney. *See Baldridge*, 19 Vet.App. at 237-38. With the above in mind, we will impose a small reduction as an anodyne to alleviate the cost associated with these shortcomings.

### B. Preparation for Oral Argument

At issue here are 93.10 hours billed over 6 days for the preparation of oral argument before the Federal Circuit, amounting to $22,678.95. EAJA Application at xix-xxii. Although practitioners should be encouraged to prepare for oral argument, "the adversary should not be

10

required to pay for more than the normal time the task should have required." *Baldridge*, 19 Vet.App. at 238. Here, many hours of the preparation for the argument was spent reviewing and discussing previous tasks, like drafting and research. For instance, 7½ hours were billed so an inexperienced attorney could further understand the contours of *Tadlock*, a relatively short case explicating a well-known principle of veterans law that counsel had already researched and discussed as he was briefing the case to the Federal Circuit. To be sure, some time spent on review is necessary, but a full day of oral argument preparation reviewing a known and previously briefed case seems unreasonable under *Andrews*. *See Duckett*, 2025 WL 3153376, at *7-8.

And the time counsel spent practicing for argument also verges on excessive for doctrines as straightforward and defined as impermissible factfinding and VA's duty to clarify the private medical opinion under *Carter*. *Cf. Nadarajah v. Holder*, 569 F.3d 906, 924-25 (9th Cir. 2009) (finding 40 hours of oral argument preparation reasonable in a case implicating complex constitutional and statutory questions warranting a 58-page opening brief). While veterans law is complex and it was the attorney's first time arguing a case before the Federal Circuit, the issues were not befuddling and it is always wrong to charge for extra time used getting an inexperienced attorney up to speed. *See Cooper v. U.S. R.R. Retirement Bd.*, 24 F.3d 1414, 1417-18 (D.C. Cir. 1994) (reducing 200 of 399.8 hours spent on briefing, research, and argument preparation when the subject was complicated, the attorney inexperienced, and the issue straightforward).

The Secretary points out that the number of hours could be seen as unreasonable given a more experienced attorney's role in helping with oral argument preparation. Secretary's EAJA Resp. at 25. It makes sense that attorneys would collaborate in preparing for an oral argument; it takes a group of attorneys to successfully moot a case so as to simulate the conditions of an actual argument. But it also makes sense that, at some point, the number of attorneys may grow too big.

Here, five attorneys read through the materials and wrote questions to help prepare for oral argument. EAJA Application at xix. And only one of those attorneys, along with the mooted attorney, ended up regularly participating in that preparation after that review. From the application alone, it is unclear what individual contribution those four attorneys gave to this task. In the end, the time spent getting this inexperienced attorney ready for this argument, the subject matter at issue, and some duplicity resulting from the input from multiple attorneys caution against awarding the full 93.10 hours. Some hours seem to have been spent on clerical tasks, like preparing a binder. *See Baldridge*, 19 Vet.App. at 246. A small reduction also accounts for these factors.

### C. Drafting a Failed Remand Motion

At issue is 15.75 hours crafting and filing an unsuccessful remand motion at the Federal Circuit, amounting to $3,873.69. EAJA Application at xii-xiii. The Secretary contends that, because the motion failed to remand the case, the time spent preparing it should be reduced or eliminated. Secretary's Br. at 21 (citing *Swinney v. Gober*, 14 Vet.App. 65, 74 (2000) (explaining that "the Court may reduce fees if the appellant has been granted only limited success as to a particular matter"); *see Farrar*, 506 U.S. at 114. Mr. Stinson counters that the motion was important since it jumpstarted the Secretary's engagement with the circuit court after considerable delay.

11

No matter what the Secretary's action was in response to the motion for remand, it is indisputable that the motion failed to remand the case because the Federal Circuit remanded based on the merits. Thus, the parties are in agreement that the motion did not meet its purpose; we may therefore somewhat reduce the award with regard to the motion. However, Mr. Stinson is correct that the Secretary had delayed litigation before the motion's filing. Because some of the delay the motion sought to remedy dissipated after its filing, it was practically useful to some degree and some reasonableness under *Hensley* shines through. *See* EAJA Application at xiii. To account for the motion's failure to remand but its success in shortening the litigation, a partial reduction is appropriate with regard to these hours.

### D. Briefing for the Federal Circuit

At issue here is 77.20 hours for Federal Circuit briefing, amounting to $11,998.39. EAJA Application at x-xii, xvii-xviii. The thrust of the Secretary's assertion seems to center on the complexity of the issues and the inexperience of one of the attorneys. The application, however, seems to show that the attorneys engaged in a rigorous review of the law, a specific writing strategy, and a comprehensive editing process that we should encourage when drafting an appeal to the Federal Circuit. And while the attorney briefed one issue before this Court prior to the appeal, he still had to brief and research other issues, not to mention exploring the differences in appellate review required at the Federal Circuit as to all arguments.

The Secretary points out that the hours seem excessive when compared to the 20- or 15-page briefs they produced. But that assertion, without some additional reasoning explaining why shorter briefs should take less time, should not convince the Court to reduce the hours spent crafting the briefs. *See Ussery*, 10 Vet.App. at 54. Indeed, shorter briefs are usually desired, no matter the complexity of an issue, so time dissecting the issues and presenting them succinctly is time well spent. Still, a small reduction is imposed based on the likely duplication of editing the briefs due to multiple attorneys, as described above.

Mr. Stinson's appeal also included 5.50 hours, amounting to $1,287.32, for drafting the tables of contents and authorities for the Federal Circuit briefs. EAJA Application at v, xviii. In *Aponte v. Nicholson*, 21 Vet.App. 470, 477 (2007), the Court reduced the hours spent drafting a table of authorities from 2.5 hours to 0.5. We should follow suit and find that most of the hours spent on the tables of contents and authorities are excessive; a private client would not likely be billed for over half a day's work creating those sections. This action does not endorse the Secretary's view that such is per se ineligible for EAJA billing (which is untrue under *Aponte*) but recognizes that the simplicity of the task does not warrant charging the taxpayers over a thousand dollars.

### E. Drafting Motions for an Extension

Lastly, the Secretary questions 1.85 hours used to draft motions for extensions of time and reschedule the oral argument, amounting to $462.52. EAJA Application at viii, x, xii, xvi. We review whether timely performance was unlikely given circumstances outside of counsel's control or whether they were drafted because counsel was inefficient. *See Hensley (Burke) v. Principi*, 16 Vet.App. 491, 498-99 (2002). It is unclear from the application, and from the briefing, precisely

why these motions were needed and why the extensions were unrelated to poor time management from the attorneys. Thus, the Court finds that Mr. Stinson fails to meet his burden to show that the motions were reasonable and we should reduce the EAJA award by cutting these hours.

\* \* \*

In light of the above, we elect to use our discretion to reduce the hours the attorneys should be compensated for by the government under the EAJA. Although a majority of the time spent on the appeal was reasonable and used to craft and conduct an appellate argument, some hours were unreasonable, excessive, or duplicative such that a private client would not be expected to pay for those hours. In carrying out reductions, we have reduced awards "by percentage at times and by reducing specific hours by line item at other times, and often we have reduced awards by some combination of these two approaches." *Baldridge*, 19 Vet.App. at 242. Here, we elect to do so by percentage rather than by line item. *Id*. ("[We] have held that a mathematical approach should be avoided in reducing hours").

### V. CONCLUSION

Although Mr. Stinson is a prevailing party under the EAJA, his application for an award cautions us against awarding the costs Mr. Stinson seeks. Based on the factors listed above and the continuous presence of unreasonable billing practices found in his application, a 25% reduction from the requested award adequately compensates Mr. Stinson for the hours reasonably expended in this litigation.

Accordingly, it is

ORDERED that Mr. Stinson's July 30, 2024, EAJA application is GRANTED IN PART in the amount of $59,773.03.

TOTH, *Judge*, dissenting: The old adage that a grumbling soldier is a happy soldier applies equally well to lower court judges, who often are charged with carrying out orders they find difficult to comprehend. And like all good soldiers, lower court judges also push back sometimes, if they're asked to weigh in on something. My colleagues—dear friends who are far wiser than me—imply that it's not our place to question a superior court, even if indirectly. But here, I cannot sign onto a ruling that effectively divests this Court of the statutory authority that Congress reserved exclusively for it to exercise—namely, to review the *factual* determinations of the Secretary for purposes of assessing administrative error.

A long line of caselaw establishes that EAJA fees can only be awarded upon a judicial finding of administrative error and where the government's position was not substantially justified. *See, e.g.*, *Robinson v. O'Rourke*, 891 F.3d 976 (Fed. Cir. 2018); *Davis v. Nicholson*, 475 F.3d 976 (Fed. Cir. 2007). My colleagues appear to read the Federal Circuit's decision as handing down a finding of administrative error—at least implicitly. I disagree for several reasons.

First, I find no way to read the Federal Circuit's decision as entering a finding—express or implicit—on the merits of the very same factual issues that it declared to be beyond this Court's jurisdiction to review. With the exception of matters not relevant here (rulemaking), it's flatly

13

impossible under the statutory scheme Congress designed for the Federal Circuit to exercise jurisdiction over the same factual issue that this Court lacks jurisdiction to address. So, even as a matter of basic textual construction, I see no way to discern administrative error in the Board's decision based on a reading of the Federal Circuit's decision.

Also, irrespective of whether this Court has jurisdiction over a factual issue, the plain terms of 38 U.S.C. § 7292 make clear that, subject to narrow exceptions not relevant here, it's legally impossible for the Federal Circuit to render a finding of administrative error, implicit or otherwise, on a run of the mill factual determination of *the Secretary*, (i.e., the Board of Veterans' Appeals). So, even to the extent that the Federal Circuit's decision hints at administrative error, it's wrong for our Court to construe such language as a formal finding of administrative error. Interpreting the Federal Circuit's decision as handing down a finding of administrative error not only risks reading section 7292(d)(2) out of existence but turns on its head the entire statutory scheme that Congress set out in sections 7261 and 7292.

Here, because the EAJA issue is so bound up in questions of statutory authority—indeed, it's dispositive—it's necessary to consider not only the plain terms of sections 7261 and 7292, but also the rationale governing the vastly different respective allocations of statutory authority that Congress conferred upon this Court and the Federal Circuit. (However expansively the Federal Circuit reads its statutory authority is its own business; like all lower tribunals, this Court abides by and enforces the rulings of superior courts. But EAJA requires this Court to determine whether *our* remand order is predicated on administrative error). And here, because the majority appears to agree that our remand is merely a pass-through and made no independent finding of error, our inquiry necessarily turns to the Federal Circuit's decision. Ultimately, the majority's ruling that Mr. Stinson is a prevailing party is only tenable if one ignores in its entirety the statutory scheme created by Congress.

In conferring authority to review veterans benefits decisions to two different federal appellate courts, Congress clearly envisioned complementary but nonetheless distinct roles for this Court and the Federal Circuit. To that end, sections 7261 and 7292 make clear that only this Court, and not the Federal Circuit, is authorized to assess error in a factual determination of the Secretary. Therefore, section 7261(a)(4) obligates this Court to review for clear error factual determinations of the Secretary that are adverse to claimants. This often requires this Court to engage with evidence of record and make determinations as to whether the Secretary's findings or analysis (or lack thereof) have a plausible basis in the record or are erroneous as a matter of law.

No analogous provision exists within section 7292, which contains only two narrow grants of authority for the Federal Circuit to review factual determinations of the Secretary. Specifically, sections 502 and 7292(c) allow for direct Federal Circuit review of the Secretary's findings relating to rulemaking, and section 7292(d)(2) allows for review of this Court's factual determinations relating to constitutional issues. Beyond those provisions, there is no authority for the Federal Circuit to review factual assessments—full stop.

And lest there be any confusion, section 7292(d)(2) squarely prohibits the Federal Circuit from reviewing how *this Court* applies the law to any particular set of facts. Normally, this provision serves as an insuperable barrier between the Federal Circuit and the Secretary, ensuring

14

that because the Federal Circuit cannot review factual applications of this Court, it's doubly impossible to reach two layers down to review administrative decisions of the Secretary.

Significantly, to delimit the respective judicial roles, Congress expressly prohibited the Federal Circuit from entertaining "mixed questions" of law and fact, where a governing legal principle can only be discerned in respect to the factual context in which it is grounded. To that end, 38 U.S.C. § 7292(d)(2) squarely prohibits the Federal Circuit from reviewing "(A) a challenge to a factual determination, or (B) a challenge to a law or regulation as applied to the facts of a particular case." This latter phrase squarely covers mixed questions.

It's hard for Congress to speak more plainly or broadly than this. Other than constitutional questions, which are expressly excepted, there is no qualifying or narrowing language in section 7292(d)(2) to suggest that *some* review of this Court's application of law to fact might be warranted if special factors are present or if this Court's ruling in a particular case is so glaringly wrong that justice or fairness requires an intervention from a higher court.[5] Congress readily knows how to draft language to grant discretionary review but chose not to.[6]

Moreover, the absolute prohibition against the Federal Circuit's reviewing mixed questions makes sense for any number of reasons. It safeguards the distinct roles that Congress intended for our respective courts, whereby the Federal Circuit's authority is reserved exclusively to performing what legal scholar and Federal Circuit founder Daniel Meador identified as the primary, and most significant, function of an appellate court, namely the "guidance" or "interpretive" function of establishing a coherent and predictable body of law for the public by interpreting statutes and regulations.[7] By contrast, Congress conferred onto this Court *both* the guidance function and the "error correction" or "correctness" function of assessing individual Board decisions for error. Contra the narrow grant of authority to the Federal Circuit, Congress drafted 38 U.S.C. § 7261 to largely mirror the scope of review conducted by federal district courts under the Administrative Procedure Act, 5 U.S.C. § 706. *See Shinseki v. Sanders*, 556 U.S. 396, 406 (2009).

---

[5] Section 7292(d)(1) establishes that the Federal Circuit shall decide "all relevant questions of law" and set aside "any regulation or any interpretation thereof (other than a determination of a factual matter)" relied on by *this Court* in its ruling. This allocation of authority allows the Federal Circuit to effectuate its de novo review of legal questions by vacating any ruling of this Court whenever it interprets a statute, regulation, or rule of law differently than this Court did.

Significantly, under de novo review, the higher court normally dispenses with reviewing the lower tribunal and instead proceeds directly to interpreting the same statutory, regulatory, or legal text or question and offering its own interpretation. As such, de novo review is a bit of a misnomer, as in practice it more closely mirrors the role of replication in scientific studies where the validity of an experiment or study is assessed based on whether a subsequent authoritative body arrives at the same result. In short, the Federal Circuit's authority to vacate this Court's rulings is incidental to its authority to establish binding readings of law by vacating any rulings grounded on contrary readings rather than to correct instances of error.

[6] For examples whereby Congress conferred onto an appellate court discretion whether to consider a matter, compare e.g. 28 U.S.C. § 1292(b) or (d); 10 U.S.C. § 867a.

[7] PAUL D. CARRINGTON, DANIEL J. MEADOR & MAURICE ROSENBERG, JUSTICE ON APPEAL 2 (1976); *see also*, RICHARD H. FALLON JR., JOHN MANNING, DANIEL MELTZER & DAVID SHAPIRO, HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 73-74 (7th ed. 2015) (distinguishing between "law declaration" and "dispute resolution" courts).

Congress's prohibition against the Federal Circuit engaging in factual review is central to the statutory scheme insofar as it prevents the duplication of labor, mission creep, confusion of roles, and other unavoidable tangles that inevitably ensue when a clear delineation between appellate courts breaks down. The prohibition also reflects the universal judgment that there exists no coherent method for distinguishing the factual and legal components of a mixed question. Acknowledging that any run of the mill factual ruling can be deemed "legal" when framed in categorical or normative terms, the Supreme Court noted that "[n]or do we yet know of any other rule of principle that will unerringly distinguish a factual finding from a legal conclusion." *Pullman-Standard v. Swint*, 456 U.S. 273, 288 (1982). Section 7292(d)(2) thus spares the Federal Circuit from having to engage in impossible line-drawing exercises, attempting to extract legal issues from fact-specific scenarios, or exercising jurisdiction selectively as a case-screening mechanism based on salient but statutorily irrelevant factors such as the quality of counsel or arguments presented.[8]

Ultimately, the guidance/error-correction distinction serves as the hermeneutic key to Title 38 in understanding the distinct but complementary allocations of authority that Congress conferred upon the three appellate bodies that review veterans benefits cases. Because it is bound by all statutes and regulations and so lacks independent interpretive authority, the Board of Veterans' Appeals performs only the error correction function of reviewing administrative decisions, rendering factual determinations, applying relevant laws, and issuing rulings on the merits of a claim. This Court, by contrast, performs both the error-correction and guidance function, reviewing the Board's finding for clear error in light of the evidence of record as well as interpreting statues, regulations, and rules of law. Completing this picture, the Federal Circuit performs the narrow but vital guidance function of establishing the definitive interpretation of any statute or regulation and resolving existing conflicts within caselaw. All of Title 38 is indexed to this basic allocation of roles.

In sum, I disagree with my colleagues that the Federal Circuit rendered a finding of administrative error as to whether the Secretary fulfilled the duty to assist—it is statutorily prohibited from doing so, and our Court should avoid reading into a higher court's decision violations of that court's jurisdiction. Instead, the Federal Circuit's ruling here extended no further than vacating a ruling as beyond the jurisdiction of this Court; at no point did it purport to adjudicate the merits of the very same matter that it held beyond the jurisdiction of this Court to review. Likewise, this Court merely effectuated the Federal Circuit's instructions and remanded

---

[8] The simplest heuristic of whether a question is purely legal or mixed is whether it can be both framed and answered without requiring analysis of the rulings of a lower tribunal. Any decision that reviews the propriety of a lower tribunal decision will necessarily have to engage with the appropriate standard of deference for appellate review. Beyond this, another easy, albeit not failproof, heuristic is whether this Court resolved the case via a memorandum decision or panel decision, which shows whether the Court discerned a purely legal question amidst the myriad allegations of error and decisions of the Secretary under review. Under *Frankel v. Derwinski*, 1 Vet. App. 23 (1990), this Court issues non-precedential single-judge memorandum decisions where no novel issue of law is presented that requires interpretation of a statute, regulation, or rule of law. Likewise, such decisions reflect the judgment of the Court that it is not applying the law to a novel factual situation not previously accounted for by existing precedent. Of course, this isn't failproof as the Court can overlook a legal issue in one of its own decisions. Likewise, a claimant may raise a legal question to the Federal Circuit by asking it to address its own precedent that this Court was bound by and applied in a memorandum decision. On balance, however, memorandum decisions reflect the judgment of this Court that no purely legal question is presented that requires interpretation or resolution.

16

for the *Secretary* to adjudicate a matter in the first instance. Neither court made any assessment of agency error. Absent a showing of such error, the claimant cannot show that he is the prevailing party and so EAJA fees are not warranted.

DATED: November 24, 2025